A. Peter CRANE, M.D.,
Plaintiff-Appellant,

v.

INTERMOUNTAIN HEALTH CARE, INC. and Sidney G. Garrett,
Defendants-Appellees.

No. 78–1346.

United States Court of Appeals,
Tenth Circuit.

Argued Oct. 17, 1979.

Decided Jan. 8, 1980.

On Rehearing En Banc Jan. 20, 1981.

Daniel L. Berman, Salt Lake City, Utah (Gary F. Bendinger and Berman & Giauque, Salt Lake City, Utah, with him on briefs), for plaintiff-appellant.

Bruce Findlay, Salt Lake City, Utah (Dan S. Bushnell, Kirton, McConkie, Boyer & Boyle, Kenneth W. Yeates and Vancott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, with him on brief), for defendants-appellees.

Before DOYLE, BREITENSTEIN and McKAY, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This appeal attacks the dismissal of an action charging violations of § 1 of the Sherman Act, 15 U.S.C. § 1. The trial court held that subject matter jurisdiction was lacking because the restraint alleged had no substantial effect on interstate commerce. We affirm.

Plaintiff-appellant Crane is a pathologist. Defendant-appellee Intermountain Health Care, Inc., owns and operates Cottonwood Hospital in Utah, and 16 other hospitals in Utah, Idaho, and Wyoming. The other named defendant, Sidney G. Garrett, is the administrator of Cottonwood Hospital. The complaint alleges that other entities and individuals have shared a common business motivation with the named defendants to restrain the practice of pathology at Cottonwood Hospital and to boycott the plaintiff's services.

The gravamen of the complaint is that the defendants have conspired to exclude plaintiff from performing pathology services at Cottonwood, have refused to consult with him and to allow staff members to do so, have required that pathology specimens of Cottonwood patients be evaluated at the laboratory of Cottonwood, and have refused to allow plaintiff to use his own laboratory in the examination of such specimens. The conspiracy is said to limit competition, restrain trade, and fix prices in the practice of pathology.

Defendants moved to dismiss on the grounds of failure to state a claim and lack of subject matter jurisdiction because of no substantial effect on interstate commerce. Plaintiff filed a request for production of documents by the defendants and to compel such production under Rule 34, F.R.Civ.P. Defendants moved for a protective order that they not be required to produce until after determination of their motion to dismiss. The deposition of the plaintiff was taken and filed. The parties briefed the issues raised by the motion to dismiss. Plaintiff presented the affidavit of one of his lawyers. After argument the district court found that "the restraint complained of does not substantially affect interstate commerce" and held that it had no subject matter jurisdiction. In so ruling, the court said that *Wolf v. Jane Phillips Episcopal-Memorial Medical Center*, 10 Cir., 513 F.2d 684, was controlling and was not limited in its application by *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338.

The opinion of the court shows that it gave consideration only to the complaint and not to the deposition of the plaintiff or the affidavit of his attorney. In the circumstances Rule 56, F.R.Civ.P., on summary judgment, has no application. "If, as a matter of law, the complaint, without consideration of matter presented but not excluded, is insufficient, a motion to dismiss is proper." *Torres v. First State Bank of Sierra County*, 10 Cir., 550 F.2d 1255, 1257.

Plaintiff says that the dismissal was premature because he had not been given an opportunity to complete his discovery. We agree with plaintiff that summary judgment should be used sparingly in antitrust litigation "where motive and intent play leading roles." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338, and *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458. We are concerned with jurisdiction, not intent. *Umdenstock v. American Mortgage & Investment Co. of Oklahoma City*, 10 Cir., 495 F.2d 589, 592, is not in point. In that case, there was independent federal question jurisdiction and antitrust violation was but one of several claims. We reversed the dismissal of the antitrust claim because the plaintiffs had been precluded from discovery to support their claim. See also *Bryan v. Stillwater Board of Realtors*, 10 Cir., 578 F.2d 1319, 1322–1326, upholding summary dismissal for lack of subject matter jurisdiction and failure to state a claim. We agree with *Doctors, Inc. v. Blue Cross of Greater Philadelphia*, 3 Cir., 490 F.2d 48, 51, that whether an effect is substantial "requires 'a practical, case-by-case economic judgment, not a conclusion derived from application of abstract or mechanistic formulae.'" (Citing cases.)

In *Wolf v. Jane Phillips Episcopal-Memorial Medical Center*, 10 Cir., 513 F.2d 684, we sustained the grant of a motion to dismiss an antitrust suit brought by a doctor against a hospital. Admission of patients to the hospital could be only by a hospital staff member. The plaintiff had been denied staff membership because he was an osteopathic physician and surgeon. The hospital had a policy against admitting osteopaths to its staff and none had been accepted. The trial court dismissed on the grounds (1) the practice of medicine is not a trade or commerce within the purview of the Sherman Act, and (2) the allegations did not support a claim that defendant's conduct substantially affected interstate commerce. On review the question of exemption was noted but not discussed. The dismissal was affirmed on the jurisdictional ground of no substantial effect on interstate commerce. *Wolf* says, Id. at 688:

"\* \* \* aside from a general allegation that his business involves interstate commerce, the plaintiff does not suggest that the defendants' conspiracy threatens his purchase of interstate goods or that the flow of such goods would be affected in any way by his exclusion from the defendants' medical staff. \* \* \* Whatever effect the alleged conspiracy might have upon interstate commerce in goods purchased by the plaintiff is insubstantial and therefore an insufficient basis for jurisdiction."

We find no significant distinction between *Wolf* and the case at bar. The plain-

tiff is not aided by his claim of price fixing. An allegation of a per se Sherman Act violation does not eliminate the need to satisfy the jurisdictional requirement of a substantial effect on interstate commerce. *McLain v. Real Estate Bd. of New Orleans, Inc.*, 5 Cir., 583 F.2d 1315, 1320–1321, cert. granted 441 U.S. 942, 99 S.Ct. 2159, 60 L.Ed.2d 1043 and cases there cited. Cf. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 783–786, 95 S.Ct. 2004, 44 L.Ed.2d 572.

The complaint alleges that defendant Intermountain, the owner of Cottonwood Hospital, provides health care services in several states and that these services substantially affect trade and commerce. An important portion of Intermountain's revenue comes from out-of-state insurance companies and the federal government. With reference to purchase of supplies, the complaint says:

" * * * it [Intermountain] purchases a substantial portion of its medical supplies from out-of-state sellers. The plaintiff, Dr. Crane, purchases a large proportion of his medical supplies used in performing his services as a pathologist at the Cottonwood Hospital from out-of-state suppliers."

Plaintiff also alleges that, as a pathologist, he has performed services for numerous patients who are residents of states other than Utah.

Plaintiff does not allege how, if at all, the conspiracy affects the rendition of medical services, the purchase of supplies, or the receipt of revenue. His claim is that because of the conspiracy he cannot practice pathology at the hospital or test specimens received from hospital patients. He does not say how this local activity affects interstate commerce. The complaint fails to disclose anything but an incidental relationship to trade and commerce among the states. General allegations of involvement in interstate commerce do not suffice to supply the nexus between restraint and substantial effect on interstate commerce. *Wolf*, supra, 513 F.2d at 688. Essentially, plaintiff is in the same position as the doctor in *Wolf* who could not become a member of the hospital staff. We agree with the trial court that *Wolf* controls.

Plaintiff argues that *Wolf* has been superseded by two Supreme Court decisions. In *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338, the plaintiff claimed that the defendants conspired to block the relocation and expansion of a hospital. The Court said, Id. at 744, 96 S.Ct. 1848, that a combination of factors including decreased out-of-state purchasing, revenues, and financing operated to establish a substantial effect on interstate commerce. The facts in the case at bar are different.

*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572, holds that a bar association minimum fee schedule, as published and enforced, violated § 1 of the Sherman Act. The dispute arose out of the fee scheduled for a title examination needed to close a real estate transaction. The Court noted, Id. at 783–784, 95 S.Ct. 2004, that a significant portion of the funds used in Virginia real estate transactions comes from without the state and that a significant amount of real estate loans is guaranteed by federal agencies located without the state. The Court said, Id. 784–785, 95 S.Ct. 2004 that title examination is an integral part of an interstate transaction and sufficiently affects interstate commerce. The real estate transactions in *Goldfarb* and the pathological examinations in the instant case have nothing in common. The complaint does not tell how pathological services affect interstate commerce. The facts presented in both *Wolf* and the instant case distinguish those cases from both *Trustees of Rex Hospital* and *Goldfarb*.

In *Bryan v. Stillwater Board of Realtors*, 10 Cir., 578 F.2d 1319, we disapproved an antitrust claim based on the rejection of a broker's application for membership in a board of realtors. *Income Realty & Mortgage, Inc. v. Denver Board of Realtors*, 10 Cir., 578 F.2d 1326, also dealt with membership in a board of realtors and held that the rejection was local action having no substantial impact or effect on interstate com-

merce. Plaintiff urges that these two decisions, and that in *Wolf* are wrong and should be reconsidered in the light of *Trustees of Rex Hospital* and *Goldfarb*. We decline to do so. One panel of the court of appeals should not overrule the decision of another panel. *United States v. United States Vanadium Corporation*, 10 Cir., 230 F.2d 646, 648–649, cert. denied 351 U.S. 939, 76 S.Ct. 836, 100 L.Ed. 1466, says:

> "In the light of these later decisions we are asked to re-examine the *Safeway* case and, in effect, are asked to overrule it. Assuming without deciding that members of this panel are not in full sympathy with the law as declared in the *Safeway* case, for reasons presently stated we nonetheless adhere to the doctrine there announced. We feel that one panel of the court should not lightly overrule a decision by another panel. To do so puts the law into a state of flux, and no one can tell what the law will be until the composition of the court is determined."

The rejection of a decision by a panel is a responsibility of the court sitting en banc.

Affirmed.

McKAY, Circuit Judge, concurring in the result:

"In the Sherman Act, Congress has been taken to have exercised to the fullest its power over commerce." L. Sullivan, *Antitrust* 709 (1977). I do not believe that our opinion in *Wolf v. Jane Phillips Episcopal-Memorial Medical Center*, 513 F.2d 684 (10th Cir. 1975), is consistent with either that congressional purpose or recent Supreme Court pronouncements. At this late date, we can no longer reasonably assert that the "business of practicing medicine and furnishing medical services is wholly intrastate" in character. 513 F.2d at 687 n.1, 688.[1] Crane has alleged, with all the particularity we should require before discovery has begun, various antitrust violations including a group boycott. He has also alleged effects on various aspects of interstate commerce, including the purchase

of medical supplies. Under the "affecting commerce" test,

> it is not the quantitative substantiality of the impact on the flow of commerce that is critical . . . .; if a local activity has in a practical sense a significant impact on competition in commerce and if the commerce so affected is substantial in amount, the [Sherman] Act applies to the local activity . . . . .

L. Sullivan, *Antitrust* 710 (1977). I believe that Crane's allegations are sufficient to withstand a pre-discovery Rule 12(b)(1) motion to dismiss.

Because I agree with the majority that it is the responsibility of the court sitting en banc to reconsider the *Wolf* doctrine, I concur in the result. This panel is bound by *Wolf* unless or until the court reconsiders the case en banc.

Before SETH, Chief Judge, and HOLLOWAY, McWILLIAMS, BARRETT, DOYLE, McKAY, LOGAN and SEYMOUR, Circuit Judges.

## ON REHEARING EN BANC

SEYMOUR, Circuit Judge.

This action is brought under section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff, Dr. Phillip Crane, was Director of Pathology at Cottonwood Hospital in Murray, Utah from 1963 to early 1976 and is presently a staff member at that hospital. He alleges a conspiracy to restrain his pathology practice and to boycott his services at the hospital. Defendant Intermountain Health Care, Inc. owns and operates Cottonwood Hospital and sixteen other community hospitals in Utah, Idaho, and Wyoming. Defendant Sidney G. Garrett is Cottonwood's administrator. These defendants have allegedly (1) refused to consult with Dr. Crane or to permit members of Cottonwood's medical staff to consult with him, (2) required that all pathology specimens of Cottonwood patients be evaluated at Cottonwood's pathology laboratory, and (3) refused to permit Dr. Crane to use either that laboratory or

---

1. We could perhaps distinguish *Wolf* on certain narrow grounds. I agree with the majority, however, that, if *Wolf* is allowed to stand, its spirit precludes a finding of jurisdiction in this case.

his own laboratory to evaluate specimens from patients of Cottonwood's physician staff members. The result of the conspiracy between defendants and certain other co-conspirators, including the Board of Directors of the hospital, is allegedly to limit competition and to fix prices in the practice of pathology.

Without affording Dr. Crane opportunity for discovery, the district court dismissed his complaint for lack of Sherman Act jurisdiction. Basing the dismissal on our decision in *Wolf v. Jane Phillips Episcopal-Memorial Medical Center,* 513 F.2d 684 (10th Cir. 1975), the court held that the complaint failed to meet the Act's interstate commerce requirement. A panel of this court affirmed. Like the district court, the panel held that *Wolf* compelled dismissal. On the same day, the Supreme Court decided *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). We granted rehearing en banc to review the panel's decision in light of *McLain* and to determine whether *McLain,* together with *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), and *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), has overruled *Wolf.* We have concluded that our precise holding in *Wolf* is not inconsistent with the principles of *McLain, Hospital Building,* and *Goldfarb,* but that dismissal of Dr. Crane's complaint was nonetheless premature. Consequently, we remand to the district court for further proceedings.

*The Jurisdictional Issue*

Dr. Crane claims his pathology practice and services have been restrained in violation of the Sherman Act, 15 U.S.C. § 1, which makes illegal "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States . . . ." *Id.* This language both defines the kind of activities Congress sought to forbid and the jurisdictional reach of the statute.[1]

█ It is now hornbook law that to satisfy interstate commerce jurisdiction under the Sherman Act the challenged activity must occur *in* the flow of interstate commerce, or, though occurring on a purely local level, substantially *affect* interstate commerce. *See McLain,* 444 U.S. at 242, 100 S.Ct. at 509 (citing cases); *Hospital Building,* 425 U.S. at 743, 96 S.Ct. at 1851; *Goldfarb,* 421 U.S. at 780, 95 S.Ct. at 2009; *Burke v. Ford,* 389 U.S. 320, 321, 88 S.Ct. 443, 444, 19 L.Ed.2d 554 (1967) (per curiam); *Mac Adjustment, Inc. v. General Adjustment Bureau, Inc.,* 597 F.2d 1318, 1321–22 (10th Cir.), *cert. denied,* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979); *Bank of Utah v. Commercial Security Bank,* 369 F.2d 19, 23 (10th Cir. 1966), *cert. denied,* 386 U.S. 1018, 87 S.Ct. 1374, 18 L.Ed.2d 456 (1967).

This case involves only the "effect on commerce" test. On rehearing, Dr. Crane contends that *Wolf* has been overruled by *McLain.* In *Wolf,* we dismissed a complaint under the Sherman Act because the facts alleged did "not support the existence

---

1. "[T]he phrase 'restraint of trade' . . . was made the means of defining the activities prohibited. The addition of the words 'or commerce among the several states' was not an additional kind of restraint to be prohibited by the Sherman Act but was the means used to relate the prohibited restraint of trade to interstate commerce for constitutional purposes, *Atlantic Cleaners & Dyers v. United States,* 286 U.S. 427, 434, 52 S.Ct. 607, 609, 76 L.Ed. 1204, so that Congress, through its commerce power, might suppress and penalize restraints on the competitive system which involved or affected interstate commerce. Because many forms of restraint upon commercial competition extended across state lines so as to make regulation by state action difficult or impossible, Congress enacted the Sherman Act, 21 Cong.Rec. 2456. It was in this sense of preventing restraints on commercial competition that Congress exercised 'all the power it possessed.' *Atlantic Cleaners & Dyers v. United States, supra,* 435, 52 S.Ct. 609."
   *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 494–95, 60 S.Ct. 982, 992–993, 84 L.Ed. 1311 (1940). *See also Rasmussen v. American Dairy Ass'n,* 472 F.2d 517, 521–24 (9th Cir. 1972) (discussion of constitutional basis for Sherman Act's jurisdictional reach), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

of the requisite nexus between the defendants' conduct and interstate commerce." 513 F.2d at 688. Crane asserts *McLain* holds that Sherman Act jurisdiction is satisfied if interstate commerce is substantially affected by defendants' general or overall business—the alleged unlawful activity need not itself cause such an effect. Language in a later decision arguably supports this contention, *see Western Waste Service Systems v. Universal Waste Control,* 616 F.2d 1094, 1096–97 (9th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980), but in our view the argument misses *McLain*'s mark. While some language in *McLain* is less than clear, an examination of that case in the context of earlier Supreme Court opinions shows that it does not signal a departure from the principles governing the "effect on commerce" test.

### Supreme Court Construction of the "Effect on Commerce" Test

In *Hospital Building,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338, the operator of a 49-bed hospital in Raleigh, North Carolina planned a major expansion that would increase the hospital's size to 140 beds. The operator sued Rex Hospital, alleging Rex had conspired with others to block the proposed expansion and to monopolize hospital services in Raleigh. The district court dismissed the complaint, ruling that provision of medical services is a purely local activity and that the alleged anticompetitive conduct insubstantially affected interstate commerce. The Fourth Circuit affirmed. Focusing on the adequacy of the nexus between the challenged activity and relevant channels of interstate commerce, *see* 425 U.S. at 742 n. 1, 743–44, 96 S.Ct. at 1851 n. 1, 1851–52, the Supreme Court reversed, holding that the complaint met the Sherman Act's "effect on commerce" test.

The complaint in *Hospital Building* alleged that if Rex Hospital succeeded in blocking the expansion, four of the plaintiff's contacts with interstate commerce

would be affected: (1) more than $100,000 of out-of-state purchases in medicines and supplies, (2) substantial revenues from out-of-state insurance companies, (3) management fees paid by the plaintiff to its parent corporation in Delaware, and (4) substantial sums from out-of-state sources to help finance the planned expansion. *See id.* at 741, 96 S.Ct. at 1850.[2] These allegations, the Supreme Court concluded, were ample for the complaint to survive a pretrial "effect on commerce" challenge. *See id.* at 744, 96 S.Ct. at 1852.

In so holding, the Court relied on its prior decision in *Burke v. Ford,* 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967). There Oklahoma liquor retailers contended that liquor wholesalers in the state had unlawfully restrained interstate commerce by dividing the state market into exclusive territories. The complaint was dismissed in the trial court for lack of proof of a substantial effect on interstate commerce. The Supreme Court reversed, stating:

> "The wholesalers' territorial division here *almost surely resulted* in fewer sales to retailers—hence fewer purchases from out-of-state distillers—than would have occurred had free competition prevailed among the wholesalers. In addition the wholesalers' division of brands meant fewer wholesale outlets available to any one out-of-state distiller. Thus the statewide wholesalers' market division *inevitably affected* interstate commerce."

*Id.* 389 U.S. at 322, 88 S.Ct. at 444 (emphasis added). Thus, because of the substantial interstate commerce in liquor and the logical relationship of that commerce to the market in Oklahoma, the Court concluded that interstate commerce had been impacted by defendants' division of the Oklahoma market. The *Hospital Building* Court said of *Burke*:

> "While the market division was patently not 'purposely directed' toward interstate commerce, we held that it nevertheless substantially affected interstate commerce

---

2. The complaint also alleged that a substantial number of out-of-state patients came to the hospital about to be expanded. *See* 425 U.S. at

741, 96 S.Ct. at 1850. The *Hospital Building* Court, however, did not discuss this as a possible factor in its analysis. *But see* note 4 *infra.*

because as a matter of practical econom- ics[3] that division could be expected to reduce significantly the magnitude of purchases made by the wholesalers from out-of-state distillers.

> "[3] We have noted that '[i]t is in a practical sense that we must view an effect on interstate commerce.' Goldfarb v. Virginia State Bar, 421 U.S. 773, 784 n. 11, 95 S.Ct. 2004, 2011 n. 11, 44 L.Ed.2d 572 (1975)."

Id. 425 U.S. at 745, 96 S.Ct. at 1852 (emphasis added).

Although Goldfarb involved the "in commerce" rather than "effect on commerce" jurisdictional test, it too emphasized the necessity of determining whether there is a practical or logical relationship between the defendant's allegedly unlawful conduct and interstate commerce. In that case, two real estate purchasers challenged a lawyers' minimum-fee schedule enforced by the Virginia State Bar. The schedule included a minimum price for real estate title searches required before a prospective lender would issue title insurance. Only members of Virginia's state bar could legally perform the title search. Reasoning that a lawyer's services are an "integral" and "inseparable" part of interstate real estate financing, the Supreme Court held that the Sherman Act's interstate commerce requirement had been met. See 421 U.S. at 783–86, 95 S.Ct. at 2011–12.

> "Thus in this class action the transactions which create the need for the particular legal services in question frequently are interstate transactions. The necessary connection between the interstate transactions and the restraint of trade provided by the minimum-fee schedule is present because, in a practical sense, title examinations are necessary in real estate transactions to assure a lien on a valid title of the borrower."

Id. at 783–84, 95 S.Ct. at 2011. This "necessary connection" between the minimum fee schedule, i. e., the unlawful conduct, and substantial interstate commerce in real estate was sufficient to support Sherman Act jurisdiction in Goldfarb without a more particularized economic showing.

> "The fact that there was no showing that home buyers were discouraged by the challenged activities does not mean that interstate commerce was not affected. Otherwise, the magnitude of the effect would control, and our cases have shown that, once an effect is shown, no specific magnitude need be proved. E. g., United States v. McKesson & Robbins, Inc., 351 U.S. 305, 310, 76 S.Ct. 937, 940, 100 L.Ed. 1209 (1956). Nor was it necessary for petitioners to prove that the fee schedule raised fees. Petitioners clearly proved that the fee schedule fixed fees and thus 'deprive[d] purchasers or consumers of the advantages which they derive from free competition.' Apex Hosiery Co. v. Leader, 310 U.S. 469, 501, 60 S.Ct. 982, 996, 84 L.Ed. 1311 (1940). See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)."

Id. 421 U.S. at 785, 95 S.Ct. at 2012.

This clear line of decisions establishes that for jurisdictional purposes a plaintiff must point to the relevant channels of interstate commerce logically affected by the defendant's allegedly unlawful conduct. Nonetheless, Dr. Crane claims McLain holds a Sherman Act plaintiff need only allege that defendant's overall business has a substantial general effect on interstate commerce, without alleging a linkage between such effect and the challenged activity. In so arguing, Dr. Crane relies upon the following passage from McLain:

> "To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful."

444 U.S. at 242, 100 S.Ct. at 509. We decline to accept Dr. Crane's interpretation. While the cited language arguably supports his position, a different construction follows the literal meaning of that passage while at the same time honoring the dictates of prior Supreme Court decisions.

In *McLain*, a class of real estate buyers and sellers alleged that real estate brokers in Greater New Orleans had conspired to fix brokers' fees, thereby violating section 1 of the Sherman Act. The district court granted the brokers' pretrial motion to dismiss the complaint for failure to meet the Act's interstate commerce requirement. The Fifth Circuit affirmed. Both courts focused on *Goldfarb*'s "integral and inseparable" rationale. They reasoned that unlike the lawyer's title search in *Goldfarb*, a broker's service rendered locally is not integral to any interstate aspect of the real estate transaction. From this they concluded that the interstate commerce requirement had not been met.

█ The Supreme Court found this analysis incomplete and reversed. *Goldfarb*, the *McLain* Court said, dealt only with the "in commerce" test for jurisdiction. The courts below had failed to consider the "effect on commerce" test. Under either test, the Court said, the plaintiff must (1) identify a "relevant" aspect of interstate commerce, and (2) specify its relationship to the defendant's activities alleged to be "infected" with illegality. *See* 444 U.S. at 242, 246, 100 S.Ct. at 509, 511.

> "To establish jurisdiction a plaintiff must allege the *critical relationship* in the pleadings and if these allegations are controverted must proceed to demonstrate by submission of evidence beyond the pleadings either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce."

*Id.* at 242, 100 S.Ct. at 509 (emphasis added). In other words, it is enough if, assuming the allegedly illegal restraint were successful, it would in pragmatic terms "have a not insubstantial effect on the interstate commerce involved." *McLain*, 444 U.S. at 246, 100 S.Ct. at 511.

█ In context, then, the Court was referring to the *challenged* activities, not the brokers' overall business, by its reference to "respondents' brokerage activities" in the passage Dr. Crane relies upon. By stating that plaintiff "need not make the more particularized showing of an effect on interstate commerce caused by the conspiracy . . . or other aspects of respondents' activity that are alleged to be unlawful," the Court was only confirming the principle set forth in *Hospital Building, Burke,* and *Goldfarb* that for jurisdictional purposes a plaintiff need not "make the . . . particularized showing." 444 U.S. at 242, 100 S.Ct. at 509. In other words, an elaborate analysis of interstate impact is not necessary at the jurisdictional stage, only an allegation showing a logical connection as a matter of practical economics between the unlawful conduct and interstate commerce. The emphasis was intended to be that a "particularized" showing is not necessary, not that a showing of a nexus between unlawful conduct and effect is unnecessary.[3]

*McLain*, in fact, almost tracks the language of *Hospital Building*, which speaks of a "critical inquiry . . . into the adequacy of the nexus between [the defendant's] conduct and interstate commerce that is alleged in the complaint." 425 U.S. at 742 n. 1, 96 S.Ct. at 1851 n. 1. *McLain* speaks of alleging a "critical relationship" between "the interstate commerce involved" and the defendant's "activities which allegedly have been infected by [illegality]." 444 U.S. at 246, 100 S.Ct. at 511.

█ An allegation that defendant's overall business has a general effect on interstate commerce is neither a necessary nor a sufficient condition for Sherman Act jurisdiction. It is not necessary because even the purely local activity of a completely local business falls within the Act's reach if it appreciably affects a channel of com-

---

3. *Western Waste Service v. Universal Waste Control*, 616 F.2d 1094 (9th Cir. 1980), does not alter our conclusion. The court there does say that under *McLain* it is unnecessary to establish that the alleged antitrust violations substantially affected interstate commerce. *Id.* at 1097. But the only support it provided for this interpretation is the language we have already quoted from *McLain*. *Id.* There was no attempt to consider other constructions of the literal meaning of those words or to interpret the language in the context of prior Supreme Court decisions. Moreover, *Western Waste* goes to considerable length to show that the complaint did allege unlawful conduct which in fact substantially affected interstate commerce.

merce demonstrably interstate in character. "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States v. Women's Sportswear Manufacturers Association,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949). Similarly, it is not a sufficient condition because even though the defendant's overall business may impact interstate commerce greatly, the challenged activity may in every practical economic sense be unrelated to interstate commerce. A mere allegation that the defendant's general or overall business affects interstate commerce falls short of alleging the required "critical relationship," for it leaves the court—impermissibly, under *McLain, see* 444 U.S. at 242, 100 S.Ct. at 509—to "presume" the nexus between the challenged activity and interstate commerce.

*McLain,* on its facts, supports these principles. The buyers' and sellers' pleadings alleged that the dealings between them and the brokers involved three channels of interstate commerce: real estate financing, title insurance, and interstate movement of buyers and sellers. Regarding the first two, matters beyond the pleadings indicated that substantial sums came from sources outside Louisiana. The Supreme Court reasoned that the brokers' activities necessarily affected the volume and terms of real estate sales and, hence, the buyers' and sellers' demand for out-of-state financing and title insurance. 444 U.S. at 246, 100 S.Ct. at 511. Under the "effect on commerce" test, the buyers' and sellers' factual submissions, taken as true for purposes of the dismissal motion, *id.* at 245, 100 S.Ct. at 510, had sufficiently specified a critical relationship between the brokers' local activity and two relevant channels of interstate commerce to permit them to proceed to trial.

In sum, we do not believe *McLain* signals a shift in analytical focus away from the challenged activity and towards the defendant's general or overall business. The analytical focus continues to be on the nexus, assessed in practical terms, between interstate commerce and the challenged activity.

"There is no . . . concern with the specific magnitude of the impact on interstate commerce caused by the alleged conspiracy. Instead, the Court in each case ends its inquiry when it has satisfied itself that *the logical and therefore probable effect* of the alleged act is to reduce the flow of goods in interstate commerce." *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48, 53 (3d Cir. 1973) (footnote omitted) (emphasis added).

*Dismissal of the Complaint in This Case*

■ While we disagree with Dr. Crane's contention that *McLain* overturned *Wolf, see* pp. 725–726 *infra,* we still must consider whether dismissal of his complaint was proper. As in the present case, both *McLain* and *Hospital Building* involved a pretrial dismissal of the complaint. In reversing each case, the Supreme Court emphasized that such dismissal should not occur "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McLain,* 444 U.S. at 246, 100 S.Ct. at 511 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)); *Hospital Building,* 425 U.S. at 746, 96 S.Ct. at 1853. The Court also said in *Hospital Building:* "[I]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building,* 425 U.S. at 746, 96 S.Ct. at 1853. *Accord, Mac Adjustment, Inc.,* 597 F.2d at 1321–22.

Judging Dr. Crane's complaint by these standards, we conclude the dismissal was premature. Reading the complaint most favorably to Dr. Crane's claims, as we must, *see McLain,* 444 U.S. at 245, 100 S.Ct. at 510; *Hospital Building,* 425 U.S. at 740, 96 S.Ct. at 1850; *Wolf,* 513 F.2d at 685, we cannot say beyond doubt that Dr. Crane can prove no set of facts to show the required effect on interstate commerce.

Three paragraphs of the complaint aptly summarize the activities Dr. Crane challenges. Paragraph 8(a)(2) alleges defendants required that all pathology specimens of Cottonwood Hospital patients be evaluated at Cottonwood's own laboratory. Paragraphs 8(e) and 8(g) allege defendants conspired

"to limit competition in the providing of pathology consultation and services at the Cottonwood Hospital by prohibiting doctors on the Cottonwood Hospital Medical Staff from obtaining medical consultation in histopathology, cytology and clinical pathology from the plaintiff,"

rec., vol. II, at 5, and

"to fix and maintain the price charged admitted patients of physician members of the Cottonwood Hospital Medical Staff for pathology services by refusing to allow the plaintiff to use any Cottonwood Hospital facilities or to use an outside accredited pathology laboratory in evaluating any tissue or clinical pathology specimens referred to plaintiff by any member of the Cottonwood Hospital Medical Staff."

*Id.* at 5–6. Allegations about effects on interstate commerce appear in paragraph 3:

"[Defendant Intermountain] is a nonprofit corporation engaged in interstate commerce in the providing of health care services in Utah, Idaho and Wyoming. The business of providing health care services, directly and indirectly, substantially effects [*sic*] trade and commerce among the several states. A major portion of Intermountain's revenue comes from out-of-state insurance companies and the federal government and it purchases a substantial portion of its medical supplies from out-of-state sellers. The plaintiff, Dr. Crane, purchases a large proportion of his medical supplies used in performing his services as a pathologist at the Cottonwood Hospital from out-of-state suppliers. During the course of plaintiff's service as a pathologist at Cottonwood Hospital, he performed services for numerous patients, residents of states other than the State of Utah."

*Id.* at 2.

Liberally read, these allegations adequately meet *McLain*'s call for identification of relevant channels of interstate commerce and their relationship to the challenged activities. First, the allegations point to commerce in three possible interstate channels: (1) commerce in medical insurance from out-of-state sources, (2) commerce in purchases of medical supplies from out-of-state suppliers, and (3) commerce arising out of the interstate movement of patients. Second, paragraphs 3 and 8 at least inferentially allege that blocking Dr. Crane's pathology practice and services at Cottonwood Hospital would affect: (1) his and defendants' out-of-state purchases of medical supplies, (2) the cost of pathology services and therefore the amount of medical insurance payments from out-of-state sources, and (3) commerce from the flow of out-of-state patients who would receive the benefits of his services. *Compare Hospital Building*, 425 U.S. at 741, 96 S.Ct. at 1850.

In view of these allegations, Dr. Crane should have the opportunity to adduce evidence and to prove, if he can, that success of defendants' alleged conspiracy would spell, in practical economic terms, appreciable and "unreasonable burdens on the free and uninterrupted flow" of commerce in the three interstate channels specified. *See id.* at 744, 96 S.Ct. at 1852; *McLain*, 444 U.S. at 246, 100 S.Ct. at 511; *Western Waste Service Systems v. Universal Waste Control*, 616 F.2d at 1096; *Mac Adjustment*, 597 F.2d at 1321–22.

Our decision here is not inconsistent with the result in *Wolf.* Plaintiff Wolf was an osteopath with a practice in Bartlesville, Oklahoma. Both of Bartlesville's area hospitals permitted only medical doctors to join their medical staff. As an osteopath, Wolf was denied membership. He sued the board of trustees of the hospitals' parent company, alleging a conspiracy to exclude him from the medical staff in violation of Sherman Act § 1.

In upholding a pretrial jurisdictional dismissal of Wolf's complaint, we did cite cases that could be read to say the profession of medicine is a *per se* local activity not sub-

ject to a Sherman Act claim, regardless of its actual relationship to interstate commerce. *See Wolf*, 513 F.2d at 687. The viability of that proposition, to the extent it may once have been good law, has been destroyed by *Hospital Building, Goldfarb*, and *McLain*. However, our holding in *Wolf* was more narrow. *See id.* at 687 n. 1. The facts alleged, coupled as they were with only a general allegation that both plaintiff Wolf's and defendants' medial practice "involved" interstate commerce, could not support a finding that "the restraint upon [Wolf's] practice causes more than an insubstantial effect upon interstate commerce." *Id.* at 687.

Our conclusion in *Wolf* squares with both *McLain* and *Hospital Building*. Unlike the three areas of "affected" interstate commerce identified in *McLain* and the four in *Hospital Building*, Wolf's complaint specified none.[4] We noted, for example, that Wolf did not suggest his interstate purchases of goods were implicated. *See* 513 F.2d at 688. *Compare, Hospital Building*, 425 U.S. at 741, 96 S.Ct. at 1850; *Doctors*, 490 F.2d at 50. As *McLain* states: "[J]urisdic-

tion may not be invoked under [the Sherman Act] unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce." 444 U.S. at 242, 100 S.Ct. at 509.

Rather than contravening the principles in *McLain* and *Hospital Building, Wolf* illustrates that interstate commerce is not implicated, for Sherman Act purposes, every time someone is excluded from a staff, organization, association, or other membership.[5] *See, e. g., Bain v. Henderson*, 621 F.2d 959 (9th Cir. 1980) (exclusion of attorney from list used for making appointments to represent indigent criminal defendants); *Harron v. United Hospital Center, Inc.*, 522 F.2d 1133 (4th Cir. 1975) (exclusion of single doctor from operating hospital's one-man radiology department), *cert. denied*, 424 U.S. 916, 96 S.Ct. 1116, 47 L.Ed.2d 321 (1976); *Daley v. St. Agnes Hospital, Inc.*, 490 F.Supp. 1309, 1317 (E.D.Pa.1980) (discharge of hospital's director of nurses).[6]

---

**4.** Nothing in the *Wolf* opinion indicates whether plaintiff Wolf specifically alleged an effect on interstate commerce arising from interstate travel by his patients. The opinion, however, likened Wolf's case to two cases that viewed such an effect as merely incidental. To the extent *Wolf* can be read as rejecting, as a matter of law, the possibility that an interstate flow of people seeking a purely local service can have a substantial effect on interstate commerce, *see, e. g., McLain v. Real Estate Bd. of New Orleans, Inc.*, 583 F.2d 1315, 1320 n. 4 (5th Cir. 1978), *rev'd*, 444 U.S. 232, 245, 100 S.Ct. 502, 510, 62 L.Ed.2d 441 (1980), it is no longer good law in light of *McLain*. The Supreme Court permitted the *McLain* buyers and sellers on remand "to establish that, apart from the commerce in title insurance and real estate financing, an appreciable amount of interstate commerce is involved with the local residential real estate market arising out of the interstate movement of people, or otherwise." 444 U.S. at 245, 100 S.Ct. at 510.

**5.** In its holding, the panel here relied on two other such illustrations in line with *Wolf: Income Realty & Mortgage, Inc. v. Denver Bd. of Realtors*, 578 F.2d 1326 (10th Cir. 1978), and *Bryan v. Stillwater Bd. of Realtors*, 578 F.2d 1319 (10th Cir. 1977). We affirmed dismissal of the Sherman Act complaint in each case for failure to properly state the Act's interstate commerce element. In *Income Realty*, the complaint essentially alleged a local publicity campaign to ruin the reputation of the plaintiff

as a real estate broker. No facts were alleged to "show any interstate involvement in the transactions of any of the parties to the litigation." *Income Realty*, 578 F.2d at 1328. Thus, we upheld dismissal because the complaint failed to properly identify any relevant channel of interstate commerce affected.

In *Bryan*, the complaint alleged that the plaintiff real estate broker had been "unjustifiably" denied membership in the local board of realtors. Members of the board, the complaint generally alleged, affected the interstate flow of real estate clients and out-of-state funds for financing and insurance. However, while Bryan asserted *he* was injured in *his* business by the Board's refusal to admit him to membership, he failed to allege "even by inference" that the board's denial of membership resulted in a restraint on the interstate commerce in real estate and financing. *See Bryan*, 578 F.2d at 1323.

**6.** *Compare Ballard v. Blue Shield of Southern West Virginia, Inc.*, 543 F.2d 1075 (4th Cir. 1976) (sustaining Sherman Act suit by six chiropractors challenging exclusion of chiropractic services from Blue Cross-Blue Shield health insurance plans), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977), *and Doctors*, 490 F.2d 48 (sustaining Sherman Act suit by single hospital challenging termination of its status as Blue Cross member hospital).

We hasten to add, however, that that test in these cases is a pragmatic one. It must be applied with the admonition that

"[t]here is no bright line dividing cases in which the effect upon interstate commerce is sufficient to permit Congress to prohibit particular anticompetitive activity under the commerce clause from those cases in which it is not sufficient. In this area perhaps more than in most, each case must turn on its own facts. As the limits of Congress' power to regulate interstate commerce are approached, deciding the category in which a particular case falls becomes a matter of degree."

*Rasmussen v. American Dairy Association,* 472 F.2d 517, 526–27 (9th Cir. 1972) (footnote omitted), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

Reversed and remanded for further proceedings consistent with this opinion.

HOLLOWAY, Circuit Judge, concurring and dissenting:

I am in agreement with the result in the concluding portion of the majority opinion, namely that the dismissal of the complaint was improper and must be set aside. I must disagree with the conclusions drawn by the majority opinion as to the meaning and effect of *McLain v. Real Estate Board of New Orleans,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441, and the continued application of our holding in *Wolf v. Jane Phillips Episcopal-Memorial Medical Center,* 513 F.2d 684 (10th Cir.).

It does not seem necessary to debate the language in the *McLain* opinion, which seems quite clear to me. The majority opinion analyzes *McLain* and the prior decisions thoroughly and then synthesizes them to reach its own conclusion. To me, that has been done by the Supreme Court in *McLain,* and the Court came down in very clear terms (444 U.S. at 242–43, 100 S.Ct. at 509–510):

To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. *Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful.* (Emphasis added).

Again, the Court emphatically pointed out that (*id.* at 243, 100 S.Ct. at 510):

If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases.

These pointed affirmative and negative statements and others in *McLain* make it plain that an antitrust plaintiff simply need not make a particularized showing of an effect on interstate commerce caused by the alleged conspiracy or other illegal acts. The effect of the majority opinion here is to wrongly impose that jurisdictional burden on the plaintiff. I agree with the Ninth Circuit's conclusion that such a jurisdictional test was rejected in *McLain.* *Western Waste Service v. Universal Waste Control,* 616 F.2d 1094, 1096–97, cert. denied, —— U.S. ——, 101 S.Ct. 205, 66 L.Ed.2d 88. Looking back at the earlier cases and drawing contrary conclusions from them means that we simply downgrade this recent, unanimous and emphatic decision by the Court on the issue.

Further, it is wrong I feel to hold that our *Wolf* opinion still applies and squares with the *McLain* decision. In *Wolf* we affirmed a holding that the complaint was "jurisdictionally deficient," (513 F.2d at 686), stating that (*id.* at 687):

We reach the same conclusion in the case at bar; the facts alleged do not support the proposition that the restraint upon plaintiff's practice causes more than an insubstantial effect upon interstate commerce.

I am convinced that this holding is clearly at odds with the plain meaning of *McLain.* While reconsidering the cases en banc I am convinced that we should overrule our *Wolf*

728

opinion, which to me is merely recognizing the effect of the *McLain* decision.

For these reasons I must respectfully dissent from the majority's interpretation of the *McLain* opinion, the continued recognition of our *Wolf* decision, and the disposition sending this case back for further proceedings under a jurisdictional standard which I am convinced is wrong.